**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **KELCY WARREN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **Case No. _____** |
| | § | |
| **ADVANCED PARTICLE THERAPY,** | § | |
| **LLC and JEFFREY L. BORDOK,** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Kelcy Warren ("Warren") files this his *Original Complaint* (the "Complaint"), complaining of Advanced Particle Therapy, LLC ("APT") and Jeffrey L. Bordok ("Bordok", together with APT, the "Defendants"), and for cause and action would show the Court as follows:

## I.   NATURE OF ACTION

1.      This is an action by Warren under the Texas Securities Act and for common law fraud against the Defendants, resulting from the Defendants' frauds, intentional misstatements, and material omissions in connection with their soliciting a $20 million investment from Warren, the proceeds of which were intended to advance the development of a proton therapy treatment center in Dallas, Texas.

2.      Specifically, the Defendants represented to Warren that his investment would be used to fund the development of a proton therapy treatment center APT was developing in Dallas, Texas.  At the time of those representations, however, the Defendants in fact knew and specifically intended that some or all of the proceeds from Warren's investment would be used to

fund other projects owned and controlled by APT, which is what the Defendants actually did once they induced Warren to make the $20 million investment.

3.      Additionally, the Defendants intentionally failed to inform Warren of material facts, and hid these facts from him, which Warren was otherwise entitled to know of prior to him making the investment.  Specifically, the Defendants intentionally failed to inform Warren that the Dallas entity that he was making his loan to had, by that time, previously transferred millions of dollars advanced to it by other lenders and investors to other entities owned and controlled by APT.  These prior transfers, and the subsequent transfers of Warren's loan proceeds, left the Dallas entity and project without sufficient funding to develop its proton therapy center, ultimately leading to its bankruptcy.

## II.      JURISDICTION AND VENUE

4.      Warren, a natural person, is a citizen of the State of Texas, as the state where Warren resides and is domiciled.

5.      Upon information and belief, Bordok, a natural person, is a citizen of the State of Nevada, as the state where he resides and is domiciled.

6.      Upon information and belief, APT is a limited liability company organized and existing under the laws of the State of Nevada, with its principal place of business located in the State of California.

7.      Upon information and belief, the sole member of APT is Oncology Partners, LLC, which is a limited liability company organized and existing under the laws of the State of Nevada, with its principal place of business located in the State of California or in the State of Nevada.

8.      The amount in controversy claimed by Warren herein exceeds $75,000.00, exclusive of interest and costs.

9.      Therefore, there being complete diversity of citizenship, and the amount in controversy exceeding the jurisdictional minimum, this Court has diversity jurisdiction over this Complaint pursuant to 28 U.S.C. § 1332(a).

10.     Venue of this Complaint before this Court is appropriate pursuant to 28 U.S.C. § 1391(b)(2) as the District which a substantial part of the events or omissions giving rise to Warren's claims occurred.   Specifically, it was in this District that the Defendants met with Warren and made the statements and omissions complained of herein, and it was in this District that the Defendants solicited Warren's investment in one or more securities, all of which form a substantial part of Warren's claims as stated herein.

### III.      PARTIES

11.     Warren is an individual residing in Dallas, Dallas County, Texas.

12.     APT may be served with process pursuant to Rule 4(h) of the Federal Rules of Civil Procedure by delivering a copy thereof to its (i) Registered Agent, Jeffrey L. Bordok, 1701 County Road, Suite F-2, Minden, Nevada 89423, and (ii) President and managing member, Jeffrey L. Bordok, at 2888 Loker Ave. E, Suite 211, Carlsbad, California 92010.

13.     Bordok, a natural person, may be served with process pursuant to Rule 4(e) of the Federal Rules of Civil Procedure at his dwelling or usual place of abode located at 1228 Wintergreen Court, Gardnerville, Nevada 89410.

### IV.     FACTS

**A.      GENERAL**

14.     Warren is a successful Dallas entrepreneur and businessman.   From time to time, various entities solicit Warren to fund their proposed projects.   Warren considers making investments in such projects on a reasonable business basis.

15.     APT is in the business of designing, developing and managing proton therapy treatment centers.  Proton therapy is an advanced form of radiation therapy that can provide cancer patients with fewer side effects or complications when compared to other forms of treatment, including chemotherapy and conventional radiation.  Proton therapy delivers an exact, high-dose of radiation to a tumor site while sparing surrounding healthy tissue and organs from damage.  The proton treatment facilities are generally out-patient centers at which the proton therapy machines and related equipment and service professionals are stationed.

**B.      THE PROTON TREATMENT CENTERS**

16.     To date, APT has developed, or is in the process of developing, four (4) proton treatment centers.  The centers are in various stages of development and operation.  Three of the proton centers are relevant to this petition.

17.     APT has an ownership interest in, and manages, a proton treatment center located in Baltimore Maryland (the "Maryland Proton Center"), through two entities it created: Maryland Proton Treatment Center, LLC ("MPTC") and Maryland Proton Treatment Holdings, LLC ("MPTH").  Upon information and belief, the Maryland Proton Center began treating patients in February 2016.

18.     APT has an ownership interest in, and manages, a proton treatment center under development in Atlanta, Georgia (the "Georgia Proton Center"), through two entities it created: Georgia Proton Treatment Center, LLC ("GPTC") and Georgia Proton Treatment Holdings, LLC ("GPTH").

19.     APT has an ownership interest in, and manages, a proton treatment center under development in Dallas, Texas (the "Dallas Proton Center").  Specifically, APT is the controlling shareholder of Dallas Proton Treatment Holdings, LLC ("Dallas Holdings"), which in turn wholly owns Dallas Proton Treatment Center, LLC ("Dallas Center").  Dallas Center, in turn,

owns approximately 4.637 acres of land generally located at 2310 N. Stemmons Freeway, Dallas, Texas (the "Dallas Land"), which was anticipated to be the location of the Dallas Proton Center.

20.     The Defendants represented to Warren (as discussed in greater detail below) that each of the proton treatment centers would be separate, stand-alone businesses and companies, each with its separate capital structure, financing and interests.

## C.     INSIDER LOANS

21.     As APT was developing the Maryland Proton Center, MPTC and MPTH ran out of funding and were struggling to raise new funding to pay the on-going development expenses, including the general contractor for that project.  At that time, Dallas Holdings had funds on hand that it had raised by way of loans from parties other than Warren.

22.     Beginning in April 2012, APT began using funds advanced to Dallas Holdings to pay the expenses to complete the development of the Maryland Treatment Center.

23.     When GPTC and GPTH likewise ran out of funds, APT began using the funds advanced to Dallas Holdings to pay the expenses to complete the development of the Georgia Treatment Center.

24.     Over the course of two years or more, APT took almost $40 million of funds (including Warren's investment proceeds, as discussed below) advanced to Dallas Holdings and transferred the funds to MPTH or MPTC to complete the development of the Maryland Proton Center and to GPTC to complete the development of the Georgia Proton Center (collectively, the "Insider Loans").  APT structured these transfers as loans from Dallas Holdings to APT, evidenced by unsecured promissory notes executed by APT, with no collateral and no guarantees.  Some of these Insider Loans were repaid over time, while others were extended upon their maturity.  APT then entered into similar promissory notes with MPTH, MPTC and

GPTC, by which those entities promised to repay to APT — not Dallas Holdings — the funds that APT had taken from Dallas Holdings.

25.     As of the filing of this Complaint, APT owes in excess of $28 million to Dallas Holdings on account of the Insider Loans, all of which have matured and have gone into default.

**D.     FRAUDULENT SOLICITATION OF WARREN**

26.     Commencing in 2012, the Defendants actively sought out Warren and actively solicited him to help fund the building of proton therapy treatments centers APT was promoting and developing across the United States.   This included multiple in-person meetings and communications with Warren and/or Renee Lorenz ("Lorenz"), Warren's authorized representative with respect to personal investments, in the State of Texas.   This also included multiple communications by e-mail and telephone with Warren and/or Lorenz.

27.     In the process, the Defendants committed fraud on Warren and violated applicable securities laws by representing to Warren that any funds he lent or invested in Dallas Holdings would be used to acquire the Dallas Land and to develop and build the Dallas Proton Center.   At the time their representations were made to Warren, the Defendants knew that the representations were false and that they instead intended to use some or all of Warren's investment in the Dallas Proton Center to pay for expenses for the development of the Maryland Proton Center and the Georgia Proton Center.

28.     In 2012, Bordok met in person with Warren in Dallas, Texas, soliciting Warren for an investment in the Dallas Proton Center on the express statements and representations that his investment would be used to acquire the Dallas Land and to build and develop the Dallas Proton Center.   Bordok knew at the time of this meeting that his statements and representations to Warren were not true, intending instead to use some or all of Warren's investment in the

Dallas Proton Center for the development of the Maryland Proton Center and the Georgia Proton Center.

29.     On August 16, 2013, Bordok sent an e-mail to Lorenz, who he knew to be the agent of Warren with respect to his personal investments, with the intention that the e-mail and information therein be relayed to Warren for purposes of soliciting an investment by Warren in the Dallas Proton Center.  That e-mail was conveyed by Lorenz to Warren and she also relied on that e-mail in advising Warren to make an investment in the Dallas Proton Center.  Michael Montgomery ("Montgomery"), APT's Vice President of Capital Markets and a personal friend of Warren, was copied on the email.  Attached to the e-mail were various solicitation materials concerning the Dallas Proton Center.  The solicitation materials transmitted by Bordok in that e-mail specifically states that "[t]he proceeds from the notes will be used during the construction phase from groundbreaking through equipment installation."  Bordok knew this to be false at the time that he transmitted the e-mail, intending instead to use some or all of Warren's investment in the Dallas Proton Center towards paying expenses to develop the Maryland Proton Center and the Georgia Proton Center.

30.     At all times relevant hereto, Montgomery was an employee and officer of APT. Because of his close personal friendship with Warren, Montgomery was charged by APT and Bordok with being the point man to solicit Warren for an investment in the Dallas Proton Center, and was in fact such a point man.  Through multiple communications and meetings with Warren, Montgomery solicited Warren to make an investment in the Dallas Proton Center.  Despite knowing that Montgomery was soliciting Warren, and intending that he do so, APT and Bordok withheld from Montgomery the existence of the Insider Loans.  Montgomery considers the existence of the Insider Loans to be material information, which he would have shared with Warren pursuant to his solicitation duties had he known of them.  In fact, APT did not inform

Montgomery of the Insider Loans until late 2014, well after Warren made his loan to Dallas Holdings.

31.     Upon information and belief, APT and Bordok intentionally kept the fact of the Insider Loans from Montgomery because APT and Bordok knew that Montgomery would inform Warren of the Insider Loans, and thus making it unlikely that Warren would make an investment in the Dallas Proton Center.

32.     Additionally, as part of its solicitation of Warren, APT used the development and funding examples of the Maryland Proton Center and the Georgia Proton Center, together with anticipated revenue and forward projections for the same, to entice him to invest in the Dallas Proton Center, characterizing the Maryland Proton Center and Georgia Proton Center developments as successful.  However, in the process, APT did not inform Warren that the development of both the Maryland Proton Center and the Georgia Proton Center had been heavily funded by funds taken by APT from Dallas Holdings, which fact, if disclosed, would have substantially altered the financial and development picture of those separate projects.

33.     At no time during any of the above solicitation, and at no time prior to Warren investing in the Dallas Proton Center, did the Defendants or anyone else inform Warren of the Insider Loans or that any of his loan proceeds to Dallas Holdings would be diverted to other APT entities and projects.

34.     At no time during any of the above solicitation, and at no time prior to Warren investing in the Dallas Proton Center, did Warren know or have reason to know or suspect of the Insider Loans or that any of his loan proceeds to Dallas Holdings would be diverted to other APT entities and projects.

35.     Warren relied on the express representations of Bordok and APT that his loan proceeds to Dallas Holdings would be used to acquire the Dallas Land and to build and develop

the Dallas Proton Center.   But for those representations, Warren would not have made his investment in the Dallas Proton Center.  Had Warren known of the Insider Loans, or that Bordok and APT did not intend to use his loan proceeds to acquire the Dallas Land and to build and develop the Dallas Proton Center, Warren would not have invested in the Dallas Proton Center.

36.     At all material times, Bordok was the president, CEO and a managing member of APT, and APT was the beneficiary of his fraudulent actions.  As such, Bordok's actions and inactions are imputed to APT.

37.     At all material times, Montgomery was acting as an officer of APT with respect to the solicitation of funds for the development of the proton centers by APT.

**E.     WARREN'S LOAN TO THE DALLAS HOLDINGS**

38.     Ultimately, as a result of the above representations and the withholding of material information, and in reliance on the same, without which Warren would not have made his investment in the Dallas Proton Center, Warren agreed to invest in the Dallas Proton Center via a promissory note in the aggregate amount of $20 million which granted Warren the option to convert up to 50% of the principal amount into equity.[1]

39.     Accordingly, on August 28, 2013, Dallas Holdings, as maker, executed that certain *Unsecured Convertible Promissory Note* payable to Warren in the original principal amount of $20,000,000.00 (the "First Dallas Note").  The purpose of the First Dallas Note was to provide funds to help build the Dallas Proton Center, including providing funds to purchase the Dallas Land.

40.     On August 29, 2013, Warren transferred, by wire transfer, the $20 million to Dallas Holdings.

_____

[1] Warren made other investments in or loans to MPTC and another APT proton center located in San Diego, California, which are not the subject of this Complaint.

41.     On September 3, 2013, at the direction of APT, which had sole and exclusive control over the bank accounts of both Dallas Holdings and Dallas Center, Dallas Holdings transferred $20 million to Dallas Center, most if not all of which was from Warren's $20 million loan to Dallas Holdings.

42.     Shortly thereafter, and without Warren's knowledge, APT caused Dallas Center to transfer substantial funds to APT on account of the Insider Loans, some or all of which were from the $20 million loan from Warren to Dallas Holdings.  For example, on October 7, 2013, Dallas Center transferred $5 million to APT; on October 29, 2013, Dallas Center transferred $2.9 million to APT; on November 27, 2013, Dallas Center transferred $1.4 million to APT; and on December 30, 2013, Dallas Center transferred $7.6 million to APT.

43.     Warren recites the above to demonstrate that the Defendants' intention to transfer some or all of his loan proceeds to Dallas Holdings was in fact their intention and was in fact carried out.  Warren does not recite the above to assert herein any claim to recover, as fraudulent transfers or otherwise, any of the Insider Loans.

44.     On or about February 7, 2014, Dallas Holdings, as maker, executed that certain *Amended and Restated Senior Secured Promissory Note* payable to Warren in the original principal amount of $20,000,000.00 (the "Secured Dallas Note").  The Secured Dallas Note amended and restated the First Dallas Note.

45.     To secure the Secured Dallas Note, on or about February 7, 2014, Dallas Center executed that certain *Deed of Trust* in favor of Warren (the "Deed of Trust"), which secures timely payment and performance of the obligations under the Secured Dallas Note.  Also on or about February 7, 2014, Dallas Holdings executed that certain *Security Agreement* in favor of Warren (the "Security Agreement"), which secures timely payment and performance of the

obligations under the Secured Dallas Note.  By the same, Dallas Holdings granted Warren a security interest in and to all of the items of collateral described therein.[2]

### F.   COLLAPSE AND BANKRUPTCY OF THE DALLAS PROTON CENTER

46.     To be clear, not all of the transfers above and not all of the Insider Loans were from funds lent by Warren to Dallas Holdings, and not all of the transfers from Dallas Holdings / Dallas Center using Warren's funds were wrongful.  For example, Dallas Center purchased the Dallas Land using some or all of the proceeds from Warren's loan.  Nevertheless, that APT would use the funds intended for the development of the Dallas Proton Center for other projects being developed by APT, namely the Maryland Proton Center and the Georgia Proton Center, despite the express representations to Warren otherwise, was wrongful and fraudulent.

47.     Moreover, the Insider Loans and the use of the Dallas Proton Center as a piggy bank by APT to support its other projects destroyed the development of the Dallas Proton Center and the ability of Dallas Holdings to repay Warren (as well other investors).

48.     Dallas Holdings defaulted on the Secured Dallas Note by failing to make the interest payments beginning in February 2015.  After notice and demand by Warren, Dallas Holdings failed to cure all defaults under the Secured Dallas Note.  Accordingly, Warren validly accelerated the Secured Dallas Note on or about April 14, 2015, and the full principal amount under the Secured Dallas Note, together with all interest, fees, costs of collection, and other amounts provided for therein.  Dallas Holdings has failed to pay the same.

49.     On June 3, 2015, Warren filed suit against Dallas Holdings, Dallas Center and APT.  On the evening before a hearing on Warren's request for a receiver over the assets of

---

[2] In the Summer of 2015, Warren transferred his interest in the Secured Dallas Note, the Deed of Trust, and the Security Agreement, together with related contract rights, to Dallas Proton, LLC, an entity affiliated with Warren. However, Warren reserved, and did not transfer or assign, any fraud, tort, or securities claim he held against APT or anyone else on account of the claims the subject of this Complaint.

Dallas Holdings and Dallas Center, both Dallas Holdings and Dallas center filed Chapter 11 bankruptcy petitions on September 17, 2015, in the United States Bankruptcy Court for the Northern District of Texas.

50.     As a direct result of the Insider Loans, the Dallas Proton Center was left without adequate funding and capitalization to continue the development of its project.  What remains is little more than a hole in the ground, and the Dallas Proton Center lacks the funds, and has no reasonable prospect to raise additional funding, to develop and finalize the project.  As a result, Warren's loan to Dallas Holdings will not be repaid in full, as originally provided for, and the value of his collateral to secure the same is a fraction of what it would have been but for the Insider Loans.

51.     Warren is in no way seeking any relief or property in this Complaint that would be considered property of the bankruptcy estate of either Dallas Holdings or Dallas Center. Rather, Warren seeks relief solely against non-debtor entities for individualized and particularized frauds and torts committed by the Defendants on Warren that are not property of any bankruptcy estate or that are otherwise causes of action assertable by Dallas Holdings or Dallas Center under the Bankruptcy Code.  By way of example, Warren does not assert herein any fraudulent transfer cause of action against APT or anyone else, and will not do so absent authority from the Bankruptcy Court.

## V.     CAUSES OF ACTION

**COUNT 1:**     **VIOLATION OF THE TEXAS SECURITIES ACT**

52.     Warren incorporates all of his allegations above.

53.     APT and Bordok by their actions in selling, or soliciting to sell, securities Warren are subject to the Texas Securities Act, Tex. Civ. St. Art. 581-1, et al. ("TSA").

54.     Under the TSA Art. 581-4, securities include, without limitation, limited partnership interest, shares, stock, notes, bonds, debentures or any other evidence of indebtedness or any other instrument commonly known as a security.

55.     APT is a statutory seller pursuant to the TSA in that it offered or sold a covered security to Warren.  APT, in selling securities to Warren, misrepresented material facts and/or omitted material facts when, without limitation, Defendants failed to apprise Warren that: (i) Defendants had previously raised money from other lenders and investors and diverted those funds and investments away from the Dallas Proton Center project to APT affiliates outside of Texas; and (ii) misrepresented and/or failed to apprise Warren that his loan proceeds, all or in part, would be diverted to APT affiliates outside the State of Texas and not spent on the represented purpose of developing the Dallas Proton Center.

56.     As a result, APT offered and/or sold securities by means of an untrue statement of a material fact, or omitted to state a material fact, necessary in order to make the statements not misleading in light of the circumstances under which they were made, and is consequently liable to Warren for securities fraud pursuant to TSA Art. 581-33.

57.     Bordok, as the President, CEO and a managing member of APT, was a statutory control person of APT.  Further, Bordok, who controlled APT, controlled a seller or issuer of securities.  Pursuant to TSA Art. 581-33(F), Bordok is jointly and severely liable with APT as the seller or issuer of securities, to the same extent as if he were the seller or issuer.

58.     As a result of the material misrepresentations and/or material omissions by APT and Bordok in their sale, or solicitation to sell, of securities to Warren, Warren has been damaged in the minimum amount of $20 million, which he is entitled to recover based upon violations of the TSA by APT and Bordok.  Additionally, Warren is entitled to recover all reasonable and necessary attorneys' fees and costs.

**COUNT 2:**    **COMMON LAW FRAUD**

59.    Warren incorporates all his allegations above.

60.    Bordok and APT made affirmative representations to Warren which were false when made, and which they knew to be false at the time that they made those representations, to the effect that the proceeds of Warren's loan to Dallas Holdings would be used to acquire the Dallas Land and to build and develop the Dallas Proton Center, when in fact they intended that some or all of those proceeds would be used, without disclosure to or the knowledge of Warren, to pay the expenses to develop the Maryland Proton Center and the Georgia Proton Center.

61.    Warren reasonably relied on these representations by APT and Bordok.  Warren would not have invested in the Dallas Proton Center had he known either of the Insider Loans or the intent that some or all of the proceeds of his loan to Dallas Holdings would be diverted by APT for use at other projects.

62.    Warren's reliance on these representations has damaged Warren in the minimum amount of his loan to Dallas Holdings (*i.e.*, $20 million), which is highly unlikely to be repaid in full.

63.    Accordingly, Warren seeks actual damages in an amount to be proven at trial and such punitive damages as are appropriate, against the Defendants jointly and severally.

## VI.    DISCOVERY RULE

64.    Warren incorporates all of his allegations above.

65.    Pursuant to the TSA, Warren is entitled to bring this suit for violation of the TSA against APT and Bordok since the sale of the investment in the Dallas Proton Center occurred less than five years ago and less than three years after Warren's discovery of the untruth and omission.  *See* TSA Section 33(h)(2)(a), (b).  APT and Bordok concealed the misrepresentations and material omissions, and Warren has only within the last year discovered that APT and

Bordok previously induced loans and investments by other investors prior to Warren making his loan to Dallas Holdings, which were diverted by APT and Bordok to affiliates outside the State of Texas and were not used for their represented purpose of constructing the Dallas Proton Center. This information was concealed from Warren by APT and Bordok, and Warren could not have discovered this fact through the exercise of reasonable diligence. APT and Bordok's omission of their diversion of previous loan proceeds and investments in the Dallas Proton Center was the omission of a material fact pursuant to the TSA.

### VII.   DEMAND FOR JURY TRIAL

66.      Warren hereby demands a trial by jury of all issues and claims raised herein

### VIII.   PRAYER

WHEREFORE, PREMISES CONSIDERED, Warren requests that Defendants APT and Bordok be cited to appear herein and answer, and then on final trial Warren prays for the following relief:

  a.      All actual damages to which Warren is justly entitled;

  b.      Exemplary damages as determined by the trier of fact;

  c.      All reasonable and necessary attorneys' fees;

  d.      Prejudgment and post-judgment interest, as allowed by law;

  e.      All costs of suit; and

  f.      Any and other such further relief to which Warren may show himself justly entitled.

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

By:    */s/ Kevin M. Lippman*
    Kevin M. Lippman
    Texas Bar No. 00784479
    klippman@munsch.com
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    drukavina@munsch.com
    James M. McGee
    Texas Bar No. 13613220
    jmcgee@munsch.com
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile:  (214) 855-7584

**ATTORNEYS FOR PLAINTIFF KELCY WARREN**